FILED
2021 Jul-29  PM 04:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| **TERESA ROWLAND,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **CIVIL ACTION NO.** |
| **v.** ) | |
| ) | _____ |
| **UNUM GROUP CORPORATION** ) | |
| **f/k/a UNUM PROVIDENT** ) | |
| **CORPORATION; and UNUM LIFE** ) | |
| **INSURANCE COMPANY OF** ) | |
| **AMERICA; and TENET GROUP** ) | |
| **LONG TERM DISABILITY PLAN,** ) | |
| ) | |
| **Defendants.** | |

## COMPLAINT

Plaintiff Teresa Rowland  ("Plaintiff") brings this action for violations of the Employee Retirement Income Security Act of 1974 committed by Unum Group Corporation, f/k/a UnumProvident Corporation and Unum Life Insurance Company of America (collectively "Unum") relating to the provision of ERISA-governed disability benefits under the Tenet Group Long Term Disability Plan ("the Plan") sponsored by Plaintiff's former employer, Tenet.  In support of the relief requested herein, Plaintiff alleges the following upon personal knowledge as to herself and as

1

to all other matters upon information and belief based upon, *inter alia*, the investigation made by and through her attorneys:

## INTRODUCTORY STATEMENT

1.      This is an action for legal and equitable relief seeking redress of violations of the Employee Retirement Income Security Act (hereinafter referred to as "ERISA").  This suit is brought pursuant to 29 U.S.C. § 1132(a), to secure disability benefits due to Plaintiff through an ERISA welfare benefits plan sponsored by Tenant and insured through a group insurance policy issued by Unum insuring the Plan.

2.      The Plaintiff seeks any and all benefits to which she may be entitled should this Court determine she is "disabled" under the terms of the Plan, including all other available long-term disability benefits issued, managed, underwritten or administered by Unum.

3.      Plaintiff seeks benefits based on the conditions documented in her medical records and other information before Unum. Plaintiff's disabling conditions include RSD, complex regional pain syndrome ("CRPS"), diabetes, asthma, hypertension, hyperlipidemia, palpitations and secondary issues stemming from these conditions. Chief among these conditions, however, is Plaintiff's RSD and CRPS.

4.     The excruciating pain Plaintiff experiences due to her neurological RSD condition is severe enough that every in-person examination conducted of her has yielded professional conclusions that not only are the complaints of pain substantiated, but that Plaintiff cannot possibly maintain attendance at level of work, even part time.

5.     Unum's only basis for denying further benefits so far has been the collective assessment of Unum's claims handler and internal physicians it employs that Plaintiff, her neurologist, an FCE examiner, and a vocational examiner are not credible and are all exaggerating.  No review associated with Unum, however, has met Plaintiff personally or examined or assessed her in person, unlike the professionals identified above.

## JURISDICTION

6.     Jurisdiction is appropriate under 28 U.S.C. § 1331 in that 29 U.S.C. §1132(e) confers jurisdiction upon the district courts of the United States where, as here, Plaintiff's claims relate to an "employee welfare benefit plan" and/or an "employee pension plan" as those terms are defined within 29 U.S.C. § 1001, et. seq. The Plan "may be found" within this district.

7.     Jurisdiction is further appropriate under 28 U.S.C. § 1332 in that the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and diversity of citizenship exists between the parties.

8.     Venue is appropriate in this District Court pursuant to 29 U.S.C. § 1132(e)(2), in that the employee welfare benefit plan at issue was at least partly administered in this District, the breaches of duty alleged herein occurred in this District, and the Defendant may be found or reside in this District and, pursuant to 28 U.S.C. § 1391(b), in that the cause of action arose in this District.

## PARTIES

9.     As of the filing of this Complaint, Plaintiff Teresa Rowland is a resident citizen of Alabama and this District.

10.     Defendant Unum Group Corporation is a foreign corporation that does business by agent or otherwise in all counties in Alabama.

11.     Defendant Unum Group Corporation is a "fiduciary" of The Plan as that term is defined by 29 U.S.C. § 1002(21).

12.     One of Unum Group Corporation's designated agents for service of process is:

c/o Corporation Service Company, Inc.
641 South Lawrence Street
Montgomery, AL 36104

13.     Unum Group Corporation is an entity exercising authority or control respecting the management or disposition of The Plan assets or the personnel exercising said authority over The Plan assets.

14.     Unum Group Corporation is an entity providing services to The Plan at issue.

15.     Unum Group Corporation is an entity meeting ERISA's definition of a "party in interest" in this case as that term is defined by 29 U.S.C. § 1002(14).

16.     Defendant Unum Life Insurance Company of America is a foreign corporation that does business by agent or otherwise in all counties in Alabama.

17.     Unum Life Insurance Company of America is a "fiduciary" of The Plan as that term is defined by 29 U.S.C. § 1002(21).

18.     One of Unum Life Insurance Company of America's designated agents for service of process is:

> c/o Corporation Service Company, Inc.
> 641 South Lawrence Street
> Montgomery, AL 36104

19.     Unum Life Insurance Company of America is an entity exercising authority or control respecting the management or disposition of The Plan assets or the personnel exercising said authority over The Plan assets.

20.     Unum Life Insurance Company of America is an entity providing services to The Plan at issue.

21.     Unum Life Insurance Company of America is an entity meeting ERISA's definition of a "party in interest" in this case as that term is defined by 29 U.S.C. § 1002(14).

5

22.    Unum Life Insurance Company of America contracted with or presently has a contract for services with Defendant Unum Group Corporation, where Unum Group Corporation performs administrative functions for the Plan.

23.    Unum Life Insurance Company of America relies on employees provided through Unum Group Corporation for administrative functions for the Plan at issue.

24.    Tenet Group Long Term Disability Plan ("The Plan") is an "employee welfare benefit plan" as defined within 29 U.S.C. § 1001, et. seq., and may be served with process by serving:

> Vice President of Compensation and Employee Benefits
> Tenet Healthcare Corporation
> 1445 Ross Avenue Suite 1400
> Dallas, TX 75202-2703

## THE PLAN

25.    Upon information and belief, The Plan at issue was funded, at least in part, by a long-term disability insurance policy sold by Unum Life Insurance Company of America, the company which also underwrote the policy.

26.    This long-term disability policy was purchased by Plaintiff's employer for the purpose of conferring a benefit upon Plaintiff and other employees.

27.     As a result, this policy qualifies as an employee welfare benefit plan as defined in 29 U.S.C. § 1002(1), and Plaintiff qualifies as a participant and/or beneficiary under The Plan as that term is used in 29 U.S.C. § 1132.

28.     Under the terms of The Plan providing for disability benefits, Plaintiff is "disabled" as defined by The Plan.

29.     On information and belief, although the Plan purports to confer discretion to Unum Life Insurance Company of America, the employees that administered Plaintiff's claim either were employed by a different entity or acted under the direction or control of Unum Group Corporation pursuant to a general services agreement, notwithstanding them having presented themselves to Plaintiff as employees of Unum Life Insurance Company of America.

## UNUM'S LIABILITY

30.     Plaintiff's present conditions began after she sustained a dog bite on her left foot in December 2017.  The attack left her with puncture wounds and stress fractures, as well as what appeared to be the dawning of her RSD. As of December 14, 2017, she was already reporting pain to her foot if anything touched it.

31.     These reports of pain continued with each appointment, reaching a 10/10 on the pain scale. Examinations showed her left foot and ankle to be painful to the touch and overall immobile.

32.     At around this same time, Plaintiff lodged what was then a claim for

short term disability benefits on or about December 22, 2017, citing the injury to her foot as her reason for being unable to return to her job as a nurse at Brookwood Medical Center, a Tenet-affiliated hospital system.

33.    After obtaining Plaintiff's medical records and information regarding her claim, Unum, which administered the STD benefit for Tenet, found Plaintiff to be disabled under her STD plan and therefore qualified for benefits through the completion of the STD six-month benefit term ending June 5, 2018.

34.    At around the same time it extended her STD benefits to the maximum date of June 5, 2018, Unum's claim team then handling Plaintiff's LTD benefit indicated it had also found her qualified to be disabled under the terms of the LTD plan as well and qualified to begin receiving LTD benefits commencing June 6, 2018.

35.    After these approvals, it was discovered through diagnostic testing on July 25, 2018 that Plaintiff had a neuroma in her left foot.

36.    Plaintiff was also diagnosed at that time as having RSD with pain in the middle half of that same foot.

37.    As that summer progressed, so to did Plaintiff's pain according to her medical records.  The pain by then had advanced to her medial ankle and she received pain blocks. She also experienced nausea from the pain.

38.    By August of 2018, Plaintiff was referred to pain management where

8

she remains to this day.  Plaintiff's initial evaluation with her pain management doctor included consistent complaints of severe pain in her left foot, to the point that it interfered with her sleep and caused her to lose her appetite and become nauseated.

39.     By November 28, 2018, Dr. Diethelm, a neurologist Plaintiff had begun seeing, reported that Plaintiff was unable to go through with any stimulation of her left ankle for a reflex check because of the pain it would cause her. In other words, he found it to be an unnecessary torture for her since the pain was that obvious to him during his overall examination.  He also described the site as presenting with a discoloration, the exhibition of allodynia, and reddening of the area, all things consistent with RSD.  He also noted her to be in extreme pain.

40.     In a letter dated December 17, 2018, Unum announced to Plaintiff that it was beginning its review into whether she would be able to satisfy the new disability definition that would begin applying to her claim after one year of benefits had been paid as of June 6, 2019.  From that date forward, the following disability definition was to apply for Plaintiff:

> After 12 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by education, training or experience.

41.     Complaints of ongoing pain continued in 2019, with examinations of Plaintiff revealing her left foot to be swollen, mottled, red, and hypersensitive to touch.

42.   In a letter dated June 26, 2019, Unum claims handler Kimberly L'Heureux informed that her claims team found Plaintiff to be qualified for benefits under this new disability definition and therefore precluded from returning to work in any gainful occupation suitable to her education, training and experience.

43.   The determination came after Unum's medical staff found the following with respect to the impact Plaintiff's diagnosed pain condition has on her functionality:

2.    Cognitively alt occs would require a variety of the following: skilled work involving making judgments and decisions, dealing with people, and/or attention to detail, preparing exact verbal and numerical records, adhering to exact medical standards.

Information in the file would support that the EE would be precluded from the above activities secondary to CRPS of the left foot that requires high doses of medications including Lyrica, Nucynta, and Tizanidine. These medications coupled with the EE's ongoing high levels of pain and increased BH symptoms are noted throughout medical records to impair the EE's concentration and short-term memory.

3.    Is the existence, intensity, frequency and duration of pain described by the EE in telephone calls and in office visit notes consistent with clinical examinations, diagnostic testing or other information in the claim file? Please explain.

Yes, clinical exams between providers document findings consistent with CRPS. This condition would be expected to result in the EE's reported symptoms.

44.   In the months after this determination was made, Unum, consistent with this medical review, continued to code Plaintiff's claim after disability definition change as having the ICD code "G90.50 Complex regional pain syndrome 1, unspecified."

45.   Plaintiff continued to receive pain management, and in September 2019 tried a spinal cord stimulator. The trial was unsuccessful and actually contributed to her pain, causing a flare at the time.

46.    It was around this time that Plaintiff also joined a CRPS support group for emotional support for what she was having to endure.

47.    Plaintiff's medical records since 2019 remain consistent about the extent of her pain, even with interventions.

48.    Assessments from Plaintiff's physicians indicating that she would not be able to attend work remained consistent also.

49.    Then, in a letter dated March 23, 2020, Unum claims handler Alyssa Elhajji, who had since taken over responsibility for overseeing Plaintiff's LTD claim, informed that a new review into her continuing eligibility for benefits had commenced.

50.    This new review was governed by the same Plan terms as the previous review where Ms. L'Heureax, Ms. Elhajji's predecessor, had Plaintiff to be entitled to benefits based on an internal finding by Unum's medical staff that Plaintiff's diagnosed pain conditions precluded her from being able to work in any capacity whatsoever, including sedentary.

51.    After they took over Plaintiff's claim, Ms. Elhajji and her new group dropped pain from consideration, and instead elected to classify the basis of plaintiff's claim as being rooted in depression, anxiety, and similar conditions in an effort to steer Plaintiff's claim toward a termination based on the policy's 2-year limitation for payment of benefits based on such conditions.

11

52.   They shifted their review accordingly, addressing questions to Plaintiff's mental health providers who in actuality were treating such conditions as being *secondary* to Plaintiff's constant, chronic pain.  This was despite receiving constant reports that Plaintiff's pain was her "biggest barrier" to returning to work.

53.   This steerage of Plaintiff's claim culminated with a review from Unum nurse Christa Young on September 17, 2020 where issued an opinion totally contradicting the one preceding Unum's June 26, 2019 determination (and which is quoted above), where she concludes, "Therefore, from a whole person perspective, considering Clmt's physician conditions in totality, information does not support that Clmt would be precluded from performing the [occupational] demands in question; however, global loss of function from BH conditions appears reasonably supported since 11/6/2018 and ongoing."

54.   The path for the forthcoming termination of Plaintiff's claim was set. Three months later, in a letter dated December 14, 2020, Ms. Elhajji announced that her new claims team had decided to deny and close Plaintiff's claim as of November 6, 2020 (two years from 11/6/2018).

55.   In doing so, Ms. Elhajji said first that the claim was approved based on a behavioral condition having a two-year limitation – which the claim record makes clear was not true – and that this date was therefore the end of that limitation period.

56.   She further stated that her claims team had found that the benefit could

12

not continue to be paid after that date because it did not find Plaintiff's physical conditions, including her RSD, prevented her from working in an alternative gainful occupation in a departure from what its own medical staff had determined previously despite there being no evidence of substantial medical improvement since then.

57.    Setting aside the fraud in Ms. Elhajji's concealment to Plaintiff as to why the claim was initially approved for payment under the Plan's "any occupation" disability standard, this finding regarding Plaintiff's physical condition appeared to emanate from a determination made within Unum that Dr. Deithelm's assessments of his patient were not credible anymore (as opposed to how they were construed by Unum's medical staff previously) and were not to be accorded any weight.

58.    There is further expression of doubt by Unum's Dr. Vaughn Cohan as to Plaintiff's personal credibility. Specifically, he stated in his review provided to the claims handler:

Medical records reflect that the claimant (despite her complaints of continuing pain) is described by treating physicians as appearing to be in no distress. There is no indication in the medical record to support an impairment in cognitive functioning, and no formal mental status exam findings are described. The claimant states she is unable to stand, walk, or bear weight on the left lower extremity, but she appears to be fully mobile via the use of her knee scooter. She would therefore be capable of meeting the above-described sedentary occupational demands. Although the claimant reports that she has difficulty performing certain activities of daily living, this is not substantiated by independent observation, and there is no indication that she is requiring or utilizing assistance for those activities. The claimant evidently has full use and coordination of the upper extremities. There is no indication that the claimant's pain or pain medications interfere with normal mental acuity and cognition. In summary, it is my opinion that the available information does not support a functional impairment that would preclude the claimant from performing the above listed sedentary occupational demands (exclusive of her behavioral health diagnoses). I am in agreement with the OSP opinion of Dr. Hammond.

59.    Unum's claims handler, disregarding the contradictions this statement

presented and content to attempt to have misled Plaintiff as to the real reason her claim had been paid up to that point, curated this finding together with a vocational report to generate the December 14, 2020 denial letter.

60.    Plaintiff thereafter retained counsel, and on May 28, 2021, transmitted via facsimile and U.S. certified mail an appeal from the termination and closure of her claim.

61.    Unum received that appeal on the same day it was sent via facsimile, as confirmed by a facsimile transmission report.

62.    On July 7, five days before Unum's deadline for deciding the appeal under Department of Labor regulations and Plan terms (the 45th day from its appeal receipt being July 12), Unum, in its first and only communication with Plaintiff since transmission of an earlier letter on June 8 announcing the identity of the appeal specialist to be assigned to the appeal, Unum provided the following update:

> We are writing about the status of your client, Teresa Rowland's Long Term Disability appeal.
>
> Our medical consultant is in the process of completing a review.
>
> We will send you our final decision in writing when we complete our appeal review.
>
> If you have questions about your client's claim or this process, please call our Contact Center at 888-852-2232, 8 a.m. to 8 p.m., Monday through Friday. If you prefer to speak with me personally, I can be reached at the same toll-free number at extension, 41319.

63.    Two days later, with only 3 days to go before Unum's deadline expired, Unum set a letter attaching almost 30 pages of what it identified as being "new

information" that it contended supported the continued termination and closure of Plaintiff's LTD claim.

64.     This "new information" included (1) a summary of Plaintiff's decision letter where it is determined that obtaining the entire SSDI record is unnecessary and unlikely to yield "any further decisional rationale or explanation of determination"; (2) a "vocational analysis" by Shannon O'Kelley, Sr. Vocational Rehabilitation Consultant; (3) a nurse review by Allison Purtell, RN, Sr. Clinical Consultant; and (4) an medical records review by "On Site Physician" (OSP) Dr. Suzanne Benson, M.D.

65.     The letter also indicated for the first time that Unum sought an extension of an unidentified duration to complete its review after having furnished the above-referenced items to Plaintiff for comment.

66.     The grounds asserted for this vague extension request were as follows: "We need this extension to provide you with an opportunity to review and respond to the enclosed information and to allow us time to review any relevant information you submit."

67.     July 12, 2021, Unum's original deadline for issuing a decision thereafter passed without Unum having issued a written determination.

68.     On July 15, 2021, Plaintiff Counsel responded to Unum's July 9, 2021 letter and attachments, noting Unum's abject failure to comply with 29 C.F.R. §

2560.503-1(h)(4) in its failure to provide such "new information" "sufficiently in advance of the date on which the notice of adverse benefit determination on review is required" such that Plaintiff could adequately respond.

69.     Plaintiff Counsel also noted that providing that opportunity for review is not a "special circumstance" under governing regulations and Plan terms since 29 C.F.R. § 2560.503-1(h)(4) specifically contemplates that the opportunity for review be given before the deadline for an adverse benefit determination decision passes.

70.     After establishing the illegality of Unum's attempted "extension" it sought to obtain for itself to delay Plaintiff's clear right to receive a timely decision, Plaintiff Counsel informed Unum that Plaintiff would provide Unum with a *consensual* extension expiring July 19, 2021. Plaintiff further indicated that she considered her administrative remedied to be "deemed exhausted" if no decision was received within that time.

71.     These four days were provided to Unum to give back to it the substantially the same amount of time (Plaintiff provided 4 days instead of 3) it had provided to Plaintiff to respond to its "new information" before her July 12 deadline on receiving a claim decision had expired.

72.     Unum failed to issue a decision within this extended deadline, issuing it instead several days later on July 22, 2021.  That decision did not depart in any way from the course Unum had already suggested it would follow based on the

16

reviews described above.

73.    Although there remain questions about the completeness of the materials Unum has produced in this case at various times, those materials known thus far to Plaintiff establish numerous breaches and errors committed by Unum while administering Plaintiff's claim, including:

(a)    The targeting of Plaintiff's claim for denial because ERISA governs;

(b)    The failure by Unum to take any meaningful measures to insulate its claims process from its inherent conflict under the Supreme Court case *Glenn v. MetLife* and instead allowing its profit motive to influence its claims administration for Plaintiff;

(c)    The withholding of relevant documents and information from Plaintiff throughout the claims process and depriving Plaintiff of the ability to obtain a full and fair review of his claim;

(d)    Taking an adversarial posture against Plaintiff instead of a fiduciary posture by searching for ways to avoid paying part or all of his claim;

(e)    Failing to conduct an adequate investigation, and not considering and/or according proper weight to relevant, supportive information;

17

(f)     Failing to accord any weight to Plaintiff's medical providers who personally examined the Plaintiff on a regular basis, and instead relying only on nurse reviewers who are unqualified to overrule such physicians;

(g)     Failing to adhere to the terms of the Plan and Department of Labor regulations, such as those governing the review of adverse benefit determinations, when a decision must be made;

(h)     Purposefully limiting and curtailing the review of its medical consultants and otherwise improperly exerting influence on them to opine against payment of benefits;

(i)     Unreasonably and arbitrarily overruling the professionals who personally examined Plaintiff;

(j)     Failing to give Plaintiff's claim a full co-morbid review and give any consideration to how her conditions impacted one another; and

(k)     Unreasonably and arbitrarily overruling *its own* prior determinations that Plaintiff was permanently disabled without there being medical evidence of substantial medical improvement in Plaintiff's conditions.

74.   As set forth above regarding Unum's fiduciary breaches, Unum's claim

decision was the product of a conflict of interest whereby it allowed its own financial interests to supersede its fiduciary obligations to Plaintiff.

75.    Employees who were responsible for the administration of Plaintiff's claim for benefits are eligible to receive bonuses and awards based at least in part on company profitability.

76.    Further, employees who had supervisory involvement and authority over Plaintiff's claims process participate in Unum Group Corporation's management incentive compensation program.

77.    Employees involved in the administration of Plaintiff's claim also participate in Unum Group Corporation's performance recognition program.

78.    To receive bonuses or awards under either the management incentive program or the performance recognition program, Unum Group employees must meet certain criteria.

79.    Satisfaction of the eligibility criteria for these programs is impacted at least in part by the denial and/or closure of claims like Plaintiff's.

80.    Unum's history of abusive claims practices reaches back for many years and includes documented policies of instructing, encouraging or incentivizing employees responsible for claims administration to deny claims, especially when that claim is found likely to be subject to ERISA.

81.    This strategy finds its inception in what has become known as the

LeBeouf Report.

82.   The LeBeouf Report and internal documents relating to the same established a strategic approach that included an "ERISA Task Force" created by Unum for the implementation of standardized claims practices that encouraged employees to consider the applicability of ERISA during the administrative process and then to target such claims for potential denial to "take advantage of ERISA protection."

83.   In an October 2, 1995 memorandum, Unum management-level employee Jeff McCall assessed the opportunities afforded by ERISA's application to aggressive handling of claims as follows:

> The advantages of ERISA coverage in litigious situations are enormous; state law is preempted by federal law, there are no jury trials, there are no compensatory or punitive damages, relief is usually limited to the amount of the benefit in question, and claims administrators may receive a deferential standard of review.  The economic impact on Provident from having policies covered by ERISA could be significant. As an example, Glenn Felton identified 12 claim situations where we settled for $7.8 million in the aggregate.  If these 12 cases had been covered by ERISA, our liability would have been between zero and $0.5 million.

> The key for determining the applicability of ERISA is whether or not the employer "sponsors" or "endorses" the plan. If the employer pays the premium, the policy would usually, but not always, be considered to be governed by ERISA.  Salary allotment or payroll deduction arrangements, by themselves, do not necessarily mean that a policy is subject to ERISA.  While our objective is to pay all valid claims and deny invalid claims, there are gray areas, and ERISA applicability may influence our course of action.

20

Memorandum of Jeff McCall (a copy of the foregoing memorandum is included in Plaintiff's ERISA administrative record).

84.   Between 2002 and 2004, Unum was subjected to investigation by several state departments of insurance.  The announced purpose of that investigation was "to determine if the disability income claims handling practices of [Unum] reflected systemic 'unfair claim settlement practices'" in violation of various state insurance laws.

85.   Upon completion of the investigation, examiners found many abuses, including unfair construction of evidence and evidentiary or contractual requirements for proving entitlement to benefits.  (A copy of the foregoing document is included in Plaintiff's ERISA administrative record).

86.   After completion of this multi-state investigation in November 2004, Unum entered into a Regulatory Settlement Agreement ("RSA") whose terms required it to pay a substantial fine and to amend its claims practices.

87.   Unum, however, did not faithfully comply with the terms of the agreement, and instead engaged in an effort to better camouflage its pre-RSA claims practices.

88.   Not long after its execution of the RSA, Unum instructed its employees to continue to decide claims as they had done previously, notwithstanding Unum's forthcoming revision of its claims procedures to satisfy any future inspectors.

89.    As part of this resumption of its pre-RSA activities, Unum continued its incentivization programs aimed at closing claims and obtaining "recoveries" for Unum in the form of released reserves.

90.    Unum employees at the claim administration level continued to take part in a company bonus system and award program tied to company profitability.

91.    Unum employees at the claims level also continued to be evaluated on a regular basis for their efforts to achieve goals connected to the enhancement of corporate profits.

92.    As set forth above, to receive bonuses or awards under either the management incentive program or the performance recognition program, Unum Group employees must meet certain criteria.

93.    Satisfaction of the eligibility criteria for these programs is impacted at least in part by the denial and/or closure of claims like Plaintiff's.

94.    Unum's "Manager Toolkit" shows metrics included within these criteria involve claim closure or termination numbers, liability acceptance rates, and claim reopen rates.

95.    These values, individually or in the aggregate, may influence the award of performance compensation or consideration of corporate advancement opportunities.

96.    Unum even explicitly directs its management employees to filter

information to those reporting to them so their interests likewise justify with those of the overall company.

97.   As Unum's documents make clear, the more an individual or unit is perceived as contributing to the meeting of Unum's financial goals, the greater their share of the bonus pool.

98.   Unum also actively tracks the pursuit of goals for closing claims or recovering or conserving reserves on a regular basis and consistent basis through Weekly Tracking Sheets.

99.   According to Unum's claims procedures pertaining to IDI milestone reviews, these goal documents are made available to the claim directors, the very individuals charged with deciding whether claims will be approved or denied and whether open claims will be terminated.

100.   Unum also uses a "balanced business scorecard" approach at the director level to ensure claims personnel remain informed throughout the year on whether the company is meeting the financial goals necessary for the availability of bonus or incentive compensation.

101.   These scorecards are among those documents evidencing the continuation of Unum's earlier pre-RSA claims practices; other Unum documents have also specifically referenced goals, expectations, projections and targets for closures.

23

102. This active conflict of interest under which Unum employees operate further calls into question the credibility of Unum's claims personnel and reviewers, such that no deference to the decision made here should be accorded.

103. Unum considered the applicability of ERISA before making its decision. This presents an additional reason for application of a *de novo* standard to their claim decision, and to excuse the Plaintiff from further utilization of Unum's claim process.

104. Finally, Unum is not entitled to deferential review because this policy is governed by Texas law. Under Texas law, discretionary clauses such as that attempted to have been included here are void pursuant to Tex. Admin. Code § 3.1201-.1203.

105. Unum did not provide Plaintiff with a meaningful opportunity for a full and fair review of her claim for benefits as required by 29 U.S.C. § 1133 and 29 C.F.R. 2560.503-1.

106. Unum's decision process has not comported with 29 U.S.C. § 1133's requirement that any notice of the denial must contain the specific reasons for such denial, written in a manner calculated to be understood by the participant, and must comport with Department of Labor regulations.

107.   Plaintiff has exhausted all Plan remedies even though Unum's failure to adhere to Plan terms or ERISA requirements and regulations did not require it. As such, this case is ripe for judicial review.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Teresa Rowland respectfully requests this court find jurisdiction and venue appropriate, and after trial, grant the following relief:

a.   For an order awarding Plaintiff all benefits due and owing in accordance with the terms of the Plans and Policies identified in this Complaint, as well as all prejudgment interest due thereon as permitted by law and equitable principles, pursuant to 29 U.S.C. § 1132(a);

b.   For a judgment against Unum and the Plan awarding Plaintiff all costs and reasonable attorney's fees incurred connected to the prosecution of and pursuit of relief in this action as permitted under 29 U.S.C. § 1132(g)(1);

c.   For an order requiring Unum and the Plan to provide Plaintiff with any additional benefits to which the Plaintiff would be entitled pursuant to a finding that the Plaintiff is disabled under The Plan(s); and

d.   Such other relief as may be deemed just and proper.

Respectfully submitted,

M. Clayborn Williams
(ASB-9101-A43M)

**The Martin Law Group, LLC**
**Attorneys for Plaintiff**
P.O. Box 20087
Tuscaloosa, AL 35402-0087
Phone (205) 343-1771
Facsimile (205) 343-1781
clay@erisacase.com

**Plaintiff's Address:**

Teresa Rowland
c/o The Martin Law Group, LLC
P.O. Box 20087
Tuscaloosa, AL 35402

**Defendants' Addresses:**

Unum Life Insurance Company of America
c/o Corporation Service Company, Inc.
641 South Lawrence Street
Montgomery, AL 36104

Unum Group
c/o Corporation Service Company, Inc.
641 South Lawrence Street
Montgomery, AL 36104

Vice President of Compensation and Employee Benefits
Tenet Healthcare Corporation
1445 Ross Avenue Suite 1400
Dallas, TX 75202-2703